**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ROBERT WILLIAMS, # 328-027     *

    Plaintiff          *

       v           *      Civil Action No. DKC-12-2121

CORIZON MEDICAL SERVICE,   *
DR. MAJID ARNAUOT,
DR. COLIN OTTEY,         *
PA KATIE WINNER,
NURSE BILL BEIMMEN,     *
NURSE DAWN HAWK,
NURSE CARLA BUCK,      *
DR. A. JOUBERT,
P.A. GREG FLURRY, [1]      *
R. Ph. NAA E. ODIFIE.
                     *
    Defendants       ***

**MEMORANDUM OPINION**

Pending is Robert Williams' ("Williams") complaint filed on July 16, 2012, pursuant to 42 U.S.C. § 1983. Defendants, Corizon, Inc., f/k/a Correctional Medical Services, Inc., Majid Arnauot, M.D., Colin Ottey, M.D., Katie Winner, P.A., Dawn Hawk, R.N., Carla Buck, R.N., Gregory Flury, P.A., and Ava Joubert, M.D.,[2] by their counsel, have filed a Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 15) with exhibits[3] to which Williams has filed an opposition (ECF No. 19) and Defendants have filed a reply (ECF No. 21). The matter is

---

[1]  Defendants' papers spell Gregory Flury's surname with "Flury," not "Flurry," as Williams provided in the Complaint. The Clerk shall amend the docket to reflect the proper spelling of Flury's last name.

[2]  Service was not obtained on pharmacist Naa E. Odifie ("Odifie") or Nurse Manager Bill Beimman ("Biemman") Williams fails to raise any claims against Odifie (ECF No. 1 at 6), and she will be dismissed as a defendant. Williams asserts Beimman "conspired" with Gregory Flury and others to stop his treatment and "steped [sic] outside his job duty to request what treatment I should get. He has told me he hate's [sic] me and because I assaulted an officer that he would do all he can to make me suffer." ECF No. 1 at 8. There are no factual allegations supporting these claims or suggesting Beimman's actions violated Williams' constitutional rights.

[3]  Defendants provide no declarations or other exhibits verifying the records. Williams does not dispute the authenticity of the records by Defendants.

briefed and ripe for disposition. The court deems a hearing is unnecessary to resolve the issues. *See* Local Rule 105.6 (D. Md. 2011). For the reasons to follow, Defendants' motion (ECF No. 15), treated as a motion for summary judgment, will be granted.

## BACKGROUND

Williams, a self-represented plaintiff and an inmate at North Branch Correctional Institution at the time he filed this complaint,[4] claims that since March 1, 2010, he has been medically mistreated in violation of his rights under the Eighth Amendment. ECF No. 1 at 8.[5] He asserts that Defendants denied him care by reporting that he is a drug seeker, by discontinuing his pain medication, by failing to reinstate his pain medications upon recommendation by an orthopedic doctor, and by discontinuing orders for his knee brace, arm immobilizer, and a cane. Williams has provided his affidavit and exhibits in support. ECF No. 1. As relief, Williams demands $200,000 damages for pain and suffering and asks the court to order that he be given "all meds ortho surgeon requested," his braces and canes, and that he be treated by a doctor other than Dr. Ottey. *See id.*

Williams claims "medical mistreatment, denial of proper medical care in a timely fashion started" when Dr. Magid Arnauot ("Arnauot") and Greg Flury, a physician's assistant, began treating him on March 1, 2010. ECF No. 1 at 8. As background, Williams explains that in July of 2009, Dr. Cendo treated him for a broken collarbone and "tore up" knee, prescribed pain medication, and recommended an orthopedic consultation. ECF No. 1, Attachment 4 (labeled by Williams as Exhibits 1 and 2). Williams states that when he was "finally" sent to orthopedist Dr.

---

[4] On May 2, 2013, Williams notified the court that he was transferred to a facility in Holdenville, Oklahoma. (ECF No. 30). His claims for injunctive relief concerning ongoing treatment to be provided by Defendants are therefore rendered moot.

[5] The Complaint is written on a pre-printed court approved form and added handwritten pages. Pages one through eight are written on the complaint form. Williams' additional handwritten pages are referenced by their Case Management/ Electronic Case Filing (CM/ECF) page number rather than the page numbers assigned by Williams.

Krishnaswamy ("Krishnaswamy")[6] some eleven months later, Krishnaswamy determined surgery might be indicated and recommended first conducting a diagnostic MRI (magnetic resonance imaging) study. Krishnaswamy also recommended Williams return within three-four weeks and continue on his pain medications.

Williams did not return for his next visit within the recommended three-four week period. Williams states that when he returned to Krishnaswamy on June 22, 2012, prison medical providers failed to send his MRI studies. Williams' X-rays showed two separations of his collarbone and a torn knee. Krishnaswamy again requested the MRI study and recommended placing Williams back on pain medications and returning his brace. ECF No. 1 at 8.

Williams faults Arnauot and Dr. Joubert ("Joubert") for failing to timely send him to an orthopedist and treating his pain in the manner recommended by Krishnaswamy. ECF No. 1 at 4. He particularly faults Arnauot for discontinuing his pain medication.

Williams faults Flury, Joubert, Beimman, Winner, Hawk, and Buck for interfering with his medical care when his shoulder was first dislocated on or about September 5, 2011. He claims Nurse Dawn Hawk ("Hawk") took three hours to see him when he dislocated his shoulder. Hawk allegedly told Williams that Dr. Ottey had directed her to leave Williams with a dislocated shoulder overnight. ECF No. 1 at 4. On September 5 and 6, 2011, Nurse Carla Buck allegedly refused to visit Williams in his cell to treat his shoulder and pain. *See id.* Winner, a physician's assistant, allegedly failed to ensure Williams received x-rays. ECF No. 1 at 6.

Williams also complains that he has been denied use of his knee and shoulder braces and a walking cane. On or about October 25, 2011, Ottey renewed Williams' medical order for braces, a cane and pain medications. ECF No. 1, Attachment 5 (designated by Plaintiff as Exhibits 1-6). Williams avers that on October 28, 2011, his "knee gave out" and he fell. ECF

---

[6] Williams spells the surgeon's surname as Kriswammy.

No. 1 at 5.  Williams faults Flury for determining his braces and cane were not clinically indicated, and overriding medical orders for his brace, cane, and front handcuffing.  ECF No. 1 at 5, Attachment 7 (labeled by Plaintiff as Exhibits 1-5).

Williams filed several administrative remedy procedure complaints regarding his medical concerns.  ECF No. 1, Exhibit 2.  On April 11, 2012, Warden Bobby Shearin responded:

> Our review of your administrative remedy has been completed and your case has been dismissed in accordance with DCD 185- 001.  Specifically, your complaint is that you have been waiting a long time to be sent out to an orthopedic appointment.  An investigation has determined that you have been seen on numerous occasions for your knee and an alleged shoulder dislocation.  The evaluations by clinical staff of your reported shoulder dislocation have been revealed as non-substantiated.  You were seen on 8/27/11 by the MD for arthralgias.  There is no documentation regarding the need for an off site orthopedic appointment.  It is advised that you talk to your Housing Unit Manager/Lieutenant about any additional questions regarding this matter.  Your administrative remedy allegations are without merit.

ECF No. 1, Exhibit 2 at 6.[7]

Defendants have submitted Williams' medical records to demonstrate that he has received continuing care for his complaints since March 10, 2010.  They argue that Williams' allegations are predicated on his disagreement with his medical providers over the course of his care and do not state a claim of constitutional violation.  ECF No. 15.

## STANDARD OF REVIEW

Matters outside the pleadings will be considered and Defendants' Motion shall be treated as a motion for summary judgment.  Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will

---

[7]   Williams acknowledges that Corizon medical providers are not DOC employees subject to the ARP process.  "ECF No. 1 at 7.  "So ARP's are no good.  But I still filed many of them." *Id.*

defeat the motion: "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must set forth specific facts showing that there is a genuine issue for trial." *See Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *See Dennis v. Columbia Colleton Medical Center, Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *See Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) and citing, 477 U.S. 317, 323-24 (1986)).

## DISCUSSION

### A.    Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the

defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97 (1976); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the defendants were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *Farmer,* 511 U.S. at 837.

Objectively, the medical condition at issue must be serious. A "serious medical need" refers to a medical need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citing *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). Proof of an objectively serious medical condition, however, does not end the inquiry. The second component of proof requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839.

Deliberate indifference to a serious medical need "describes a state of mind more blameworthy than negligence." *Id*. at 835. It requires proof that the prison official knew of or was aware of the inmate's need for medical attention and disregarded an excessive risk to the inmate's health or safety. *Id*. at 837. Put another way, for liability to attach based on a violation of the Eighth Amendment, the law "requires consciousness of a risk...." *Id*. at 840. "Actual knowledge or awareness on the part of the alleged inflicter ... becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.' " *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer,* 511 U.S. at 844).

Even if the requisite subjective knowledge is established, a prison official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)).

Of import here, "any negligence or malpractice on the part of ... doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor ignored symptoms linked to a serious medical condition of which the doctor was aware, the subjective knowledge required for Eighth Amendment liability is not present. *See id.* at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge). Disagreements between medical staff and an inmate as to the necessity for, or the manner or extent of, medical treatment do not rise to a constitutional injury. *See Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Wright v. Collins,* 766 F.2d at 849; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). Williams' claims will be considered in the context of this Eighth Amendment analysis.

### B. Defendants' Response and Exhibits

Defendants assert that Williams has received medical care continuously throughout the period at issue. *See e.*g. ECF No. 15, Exhibit CC (listing findings of diagnostic tests). They note that as of March 10, 2010, Williams was receiving Tylenol with codeine ("Tylenol #3"), a narcotic pain medication, Ultram ER, a narcotic pain medication, and Robaxin, a muscle relaxant. ECF No. 15, Exhibit B. On March 10, 2010, an orthopedic consultation was requested for Williams. ECF No. 15, Exhibit C. On March 11, 2010, Williams' right shoulder was again

x-rayed. ECF No. 15, Exhibit H. The x-ray showed "no evidence of an acute fracture, dislocation or subluxation." *Id*. On April 22, 2010, x-rays taken of Williams' right knee showed mild degenerative changes. ECF No. 15, Exhibit I.

Defendants further note that Williams was evaluated by an orthopedic surgeon in 2009 (ECF No. 15, Exhibits D and E), and x-rays of his shoulders returned normal findings. ECF No. 15, Exhibit F. An MRI of Williams' right knee performed on September 23, 2009, showed a small bone contusion involving the medial femoral condyle.[8] ECF No. 15, Exhibit G.

### C. Claims Against Defendants

1. <u>Corizon</u>

Williams claims Corizon Inc.("Corizon") f/k/a Correctional Medical Services, Inc., as a private contractor providing medical services to prisons in the state of Maryland" is "surpose [sic] to over see [sic] the doctors and all medical staff to make sure they are doing there [sic] jobs proper and given [sic] the right care to inmates." ECF No. 1 at 7. Corizon asserts it is entitled to dismissal because any claims against the corporation are based on respondeat superior liability which does not apply in 1983 litigation.

Williams raises no claims against Corizon other than it employs the individual medical providers named as defendants. Williams may not hold the defendant corporation liable under the doctrine of respondeat superior or vicarious liability because the principle is generally inapplicable in § 1983 actions. *See Vinnedge v. Gibbs*, 550 F.2d 926, 927–99 (4th Cir. 1977); *Monell v. Department of Social Services of City of N.Y.*, 436 U.S. 658, 691 (1978); *Powell v. Shopco Laurel Co.,* 678 F.2d 504, 506 (4th Cir. 1982). As such, Corizon is entitled to dismissal.

---

[8] The medial femoral condyle is the area on the femur, or lower leg bone. A contusion, in this context, is bruising of the bone. Often, treatment involves limiting or restricting bearing weight to the area in order to allow time for healing. *See* http://www.ask.com/question/medial-femoral-condyle-bone-contusion, citing www.ncbi.nlm.nih.gov.

2. Majid Arnauot, M.D.

On April 13, 2010, Arnauot evaluated Williams for right knee and right shoulder pain. ECF No 15, Exhibit J. Noting Williams' history of manipulative behavior involving apparent seizures and shoulder dislocations and the normal diagnostic studies and normal physical examination and expressing concern that Williams' treatment plan included narcotics, Arnauot ordered acetaminophen to replace Williams' narcotic medication. *See id*. Additionally, he ordered an x-ray of Williams' right knee and submitted a request for an orthopedic consultation. *See id.* On April 21, 2010, Arnauot wrote on Williams' medical record that "ultram is not the first or the s[e]cond line treatment," but stated that he would wait to see the orthopedic surgeon's report.[9] ECF No. 15, Exhibit K.

On May 10, 2010, Arnauot examined Williams who presented complaints of shoulder and knee pain. He recorded that Williams was talking, laughing, and joking during the medical appointment, but kept claiming "my joint is killing me." ECF No. 15, Exhibit L. Arnauot's notes from that visit indicate narcotic pain medication was unnecessary, and he changed Williams' pain medicine from acetaminophen to ibuprofen. *See id.* Further, he observed Williams' x-rays were normal and Dr. Cendo, the orthopedic surgeon who first evaluated Williams, found no shoulder dislocation. *See id*. Arnauot noted Williams was scheduled to see an orthopedic surgeon on June 18, 2010.

Williams was again seen in the medical department on June 16, 2010, for a dislocated right shoulder. ECF No. 15, Exhibit M. He was administered Nubain, a pain medication, by injection and given a sling. *See id*.

---

[9] Ultram is the brand name for a medication containing tramadol, a centrally acting opioid analgesic. *See* http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=1f012f4e-bd71-48be-a1b9-ab1c8037520a.

On June 18, 2010, Williams saw Krishnaswamy for a follow-up visit. Krishnaswamy made the following recommendations.

> With a diagnosis of previous 3rd degree acromioclavicular separation of the right shoulder with rotator cuff tear and arthritis with possible torn meniscus and torn ligaments in his right knee, I advised that he undergo an MRI test of the right shoulder for a rotator cuff tear and possible labrum tear, but I also advised that he have an MRI done of the right knee for a torn meniscus and ligament injury. I provided him with an arm sling, and he will continue with the knee brace treatment. He needs the MRI done of the right shoulder and right knee as soon as possible. In the meantime, he continue[sic] with Ultram ER 200 mg daily, Robaxin 500 mg b.i.d., and Neurontin 600 mg t.i.d. He will be followed up with me soon after the MRI is done of the right shoulder and right knee. I do feel that he will need surgery for his right knee and right shoulder in the future depending on what the MRI shows.

ECF No. 15, Exhibit N.[10] Insofar as Krishnaswamy recommended Williams "continue" with Ultram ER 200 mg daily, Robaxin, and Neurontin 600 mg, Williams, as indicated above, was no longer on these medications. *See id.*

The next day, June 19, 2010, while at Jessup Correctional Institution, Williams complained his right shoulder was dislocated and provided the nurse with the wrong DOC (Department of Correction) number, birthdate, and second name. ECF No. 15, Exhibit O. The nurse wrote "[h]e did all this to prevent me from finding his medical history." *Id.* Defendants aver he was attempting to obtain pain medication by deceiving medical staff so that they would send him to the emergency department. *See id.* After Williams was properly identified, he was administered Nubain. *See id.*

On June 25, 2010, a note was written by hand[11] on Williams chart. It reads: "I talked to Dr. Ashok Krishnaswamy today 06/25/10 and he agreed to give either Tylenol or NSAIDS only

---

[10] It does not appear Williams was scheduled to see an orthopedist again until sometime in June of 2011. ECF No. 15, Exhibit JJ; *see infra* p 15. Notably, the medical records provided do not show Krishnaswamy's final recommendation regarding surgery. *See infra* p. 19.

[11] The signature of the provider is illegible.

pending his final diagnosis." *Id.*; *see also* ECF No. 15, Exhibits P-R. On July 2, 2010, Arnaout wrote that he "talked with the ortho personally and reviewed with him this inmate history, and he agreed to keep him on acetaminophen or NSAIDS until the consultation f/u." ECF No. 15, Exhibit P. A second medical opinion appears to have been sought because on July 13, 2010, Isaias Tessema, a physician at Western Correctional Institution, wrote:

> Patient well known to the writer and chart reviewed and concur with current treatment plan that Dr. Arnaout has put in place as well as the work up and consultations made. Narcotic analgesics and Ultram are not absolute necessities as his current pain medications should suffice for the physical exam findings.

ECF No. 15, Exhibit R.

On August 16, 2010, an MRI study was conducted on Williams' right shoulder.[12] On August 23, 2010, Arnauot wrote that the MRI showed 1) supra and infraspinatus tendinosis/tendinitis; 2) mild AC joint osteoarthritis; and 3) old healed lateral clavicle fracture. ECF No. 15, Exhibit S. Defendants assert no dislocation, rotator cuff tear, or other damage was found. ECF No. 15 at 7.

On November 12, 2010, Williams was prescribed Ultram ER, Robaxin, and Neurontin. ECF No. 15, Exhibit T. On November 14, 2010, the order was delayed for review as to the necessity of chronic use of Ultram ER. ECF No. 15, Exhibit U. Williams was given Tylenol #3 on November 30, 2013, pending review of the Ultram ER order. ECF No. 15, Exhibit V.

On December 7, 2010, Williams met with Gregory Taylor ("Taylor"), M.D. who wrote of the visit:

> I have already discussed the new policy which the Division of Correction is instituting with the limited use of opiate medications, under what circumstances, and for limited periods of time. This would be applied in such a fashion for the consideration of the safety of the inmate population as a whole, as well as staff.

---

[12]   Defendants' exhibits do not indicate whether an MRI of the knee was performed as recommended by Dr. Krishnaswamy. *See supra* pp. 9- 10.

> The patient has an order for the Tylenol # 3 through 12/8/2010, which we will allow to finish, but choose not to renew. His dose of the Tylenol with codeine [sic] is of such a low level as not to necessitate titration down before cessation. We will offer the patient Naprosyn 500 mg in its place, which is at least equi [sic] analgesic.

*See id*. Williams' non-narcotic pain medications, Neurontin and Robaxin were continued. *See id*.

Williams was seen again by Taylor for knee and shoulder pain on December 23, 2010. ECF No. 15, Exhibit W. Taylor prescribed a ten-day course of Tylenol #3 for Williams to be taken "crushed and floated" on top of water, and increased his dosage of Neurontin. *See id*. Taylor wrote on the medical record "OPIATES WILL NOT BE GIVEN CONTINUOUSLY, but only if provider sees specific need for BRIEF THERAPY." *Id*.

Defendants assert that between January 1, 2011 and October 25, 2011, Williams was seen by medical providers eleven times.[13] On March 18, 2011, Flury saw Williams for complaints of arthralgias (joint pain). Flury observed Williams was able to purposefully dislocate his shoulder in an effort to obtain pain medication. ECF No. 15, Exhibit Y. Flury wrote:

> Pateint [sic] is well known to this provider and is aware of previous attempts by this pateint to manipulate his shoulder for secondary gain. Pateint [sic] was last evaluated [sic] for same complaint 3/4/11 by Dr. Getachew and was subsequently sent to ER for evalaution. [sic] Reviewed notation from PA Schindler 3/4/11 stating "Pt returned from ER dx'd w/a shoulder sprain. Was asked to eval pt. He says he was given Ativan & his shoulder slipped back into place. Pt was put in a shoulder immobilizer. It has no metal parts. Recommendation from the ER is to use it for 10 days. Was able to locate ER notes which reports exam "no visible deformity". Xray perfomed at ER states "no evidence of fractures. No gross evidence of dislocations." Pateint [sic] received Ativan and Toradol, was diagnosed shoulder sprain and released to NBCI with shoulder immobilizer to be worn x 10 days. Pateint [sic] was sent to WCI xray today for xray of right

---

[13] Defendants provide only records from one medical appointment on February 4, 2011 as an example. ECF No. 15, Exhibit Y. Submitted records indicate Williams was also seen for shoulder complaints on March 4 and 18, 2011. ECF No. 15, Exhibit Y.

shoulder, which returned demonstrated [sic] normal positioning of glenohumeral joint.[14]

ECF No. 15, Exhibit Y.

In light of the above, the court finds the record shows Arnauot provided continuing care for Williams based on examination and observation, x-rays, medical history, and consultation with other physicians, including Dr. Krishnaswamy. Even when it appears Anauot doubted the gravity of Williams' reported pain, he continued to prescribe a conservative course of care for his pain, consulted with other providers, and requested diagnostic studies. Clearly, Williams did not agree with the course of his care, especially in regard to pain medication and the apparently protracted period for orthopedic follow-up. Arnaout's medical treatment of Williams, however, does not amount to deliberate indifference to Williams' medical needs.

Disagreement with a medical provider does not amount to a violation of constitutional magnitude. An inmate's difference of opinion over matters of expert medical judgment or a course of medical treatment does not rise to the level of a constitutional violation. *See Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010). Mere negligence, malpractice,[15] or incorrect diagnosis is not actionable under 42 U.S.C. § 1983. *See Estelle*, 429 U.S. at 106. No genuine issue of material fact is presented and Arnauot is entitled to summary judgment in his favor.

3.      Dawn Hawk, R.N.

Williams claims Nurse Dawn Hawk ("Hawk") refused to treat his dislocated shoulder on September 5 and 6, 2011. *See supra* p. 3. Williams' medical record indicates that on September

---

[14]   The glenohumeral joint is a ball-and-socket joint that allows for the arm to move in a circular rotation as well as movement of the arm towards and away from the body. *See* http://vsearch.nlm.nih.gov/vivisimo/cgi-bin/query-meta?query=glenohumeral+joint+&v%3Aproject=nlm-main-website.

[15]   Under Maryland, law a claim of medical negligence or malpractice may proceed only after review before the Maryland Health Claims Arbitration Board. *See* Md. Code, Cts & Jud. Proc., § 3–2A–01 et seq.; *see also Carroll v. Konits*, 400 Md. 167, 172, 929 A.2d 19, 22 (2007); *Davison v. Sinai Hospital of Baltimore, Inc*., 462 F. Supp. 778, 779–81 (D. Md.1978); *Group Health Association, Inc. v. Blumenthal*, 295 Md. 104, 114, 453 A.2d 1198 (1983). There is no demonstration that Williams has sought or completed such review.

7, 2011, Hawk responded to Williams' complaint that he had fallen on a towel, hit his face, and hurt his neck. ECF No. 15, Exhibit Z-1. During the medical assessment, Williams complained his shoulder had been dislocated for three days. Hawk informed Williams she would notify Dr. Ottey, which she did, and Ottey indicated he wanted to see Williams the next day. *See id.*

Additionally, Williams contends Hawk refused to treat his dislocated shoulder on June 6, 2012, for an unspecified "medical emergency." ECF No 1 at 4 (attachment). Williams' medical records indicate he was seen by Hawk at 9:46 p.m. that evening. ECF No. 15, Exhibit KK. She evaluated his complaints, noted he was seen the previous day by Dr. Ottey, and scheduled an appointment for Williams for the following day. *See id.*

Williams' medical records contradict his allegations against Hawk. The timeliness of Williams' care is in dispute. It is clear, however, that he was receiving on-going care for his chronic knee and shoulder pain during this time period, including medication for pain relief. Thus, under these circumstances the court finds Williams' allegations, even if true, do not amount to a violation of constitutional proportion. Accordingly, summary judgment will be entered in Hawk's favor.

4.    Greg Flury, P.A.

Williams faults Flury for discontinuing orders for his arm immobilizer, cane, and front-cuffing on October 27, 2011. Williams objects to Flury's discontinuation of his orthotics, cane, and cuffing orders based on decisions made by "doctor's [sic] that don't know my case. They do not work in NBCI or WCI, none of them ever wrote reports in my file." ECF No. 19 at 5.

Williams' medical records demonstrate that the orders were discontinued pursuant to a case conference with attending physicians Temesgen, Espina, Oteyza, Ottey, and nurse practitioner Mull. ECF No. 15, Exhibit AA. The case conference panel determined that in light

of Williams' history of manipulative behaviors and assaults on staff, he "may not have any cane or orthotic without necessary physical findings to warrant them." *See id.*

On October 28, 2011, Williams was observed standing on both legs and demonstrating no discomfort despite complaints of a fall earlier in the day that had allegedly rendered him unable to walk. ECF No. 15, Exhibit BB. Upon examination of Williams' knee brace, corrections staff discovered "a slit in the outer material with a pocket burrowed between the outer surface of the inner foam layer, purportedly for hiding contraband." *Id.* As a result, the knee brace was confiscated. *See id.*

On November 11, 2011, Flury explained to Williams again why his cane and orthotics were unnecessary. Flury also explained Williams' pain medications, Ultram and gabepentin, were being tapered to wean him. *See id.* Williams was continued on Naprosyn, a NSAID for pain relief. *See id.*; see also ECF No. 15, Exhibit CC.

Williams' allegations fail to show Flury was deliberately indifferent to Williams' serious medical needs when he discontinued the orders. Flury, a physician's assistant, was following the decision of a medical panel composed of physicians and a nurse which reviewed Williams' medical case history. There is no genuine issue of material fact presented, and Flury is entitled to summary judgment in his favor as a matter of law.

5. <u>Ava Joubert, M.D.</u>

Williams claims that on December 13, 2011, Dr. Joubert ("Joubert") showed deliberate indifference when she wrote on her report that he was a drug seeker, his order for a cane was discontinued because he did not use the cane, and she failed to prescribe pain medication for him. ECF No. 1 at 8. Williams contends that he always used his cane. *See id.* In addition, he

claims Joubert acted with deliberate indifference on June 7, 2012, when she "said [Williams] was faking." ECF No. 1 at 5.

Dr. Joubert's notes from December 13, 2011, summarized Williams' medical history as follows: 1) numerous times of shoulder dislocation inmate able to dislocate at will and will often pop it back in; 2) numerous complaints of knee pain; 3) knee braces taken because there was no indication for use and upon confiscation of the knee braces there were holes cut in the braces to make a pocket which may be used for contraband; 4) cane discontinued due to non-use; and 5) drug seeking behavior. ECF No. 15, Exhibit DD. In the same report Joubert outlined her plan of care for Williams to include: 1) obtaining plain view x-rays of knees; 2) physical therapy for his chronic knee and shoulder; pain and recurring shoulder dislocation 3) possible steroid injection for knees; 4) no Ultram; and 5) no narcotic pain medications. *See id*. On the same day, she requested physical therapy for Williams' shoulder and knee pain. ECF No.15, Exhibit EE.

Williams asserts he received only four sessions of physical therapy. ECF No. 19 at 6. He claims "Dr. Ava Joubert knew of all my ortho injurys [sic] but choose [sic] not to do anything." *Id*. Williams denies cutting holes in his brace to hide contraband, and states the cuts were made by corrections officers to remove steel rods in the brace ECF No. 19 at 5.

Williams received medical treatment throughout 2012 for his shoulder and knee issues, including: physical therapy; non-narcotic medication, narcotic medication on an "as needed" basis; and x-rays. ECF No. 15, Exhibits EE, FF, GG. On February 15, 2012, X-rays taken of Williams' right knee found "[f]rontal, lateral and oblique projections of the knee demonstrate no evidence of an acute fracture, dislocation or subluxation. Joint spaces and alignment are preserved. No joint effusion is noted." ECF No 15, Exhibit HH. X-rays of Williams' right shoulder demonstrated "no evidence of an acute fracture, dislocation or subluxation" and "[n]o

significant abnormality" was observed.  *Id*.  Medical providers witnessed Williams using his right arm and hand without complaint and being handcuffed from behind without appearing to be in discomfort.  ECF No. 15, Exhibit II.

Williams' records indicate that on or about June 18, 2011, he refused to go to scheduled orthopedic appointment, reportedly because he did not get his Tramadol pain medication.  ECF No. 15, Exhibit JJ.

On April 11, 2012, Williams refused to return to see Dr. Krishnaswamy.  William Beeman, R.N., wrote:

> [I]nmate refused medical trip for orthopedic evaluation @ Bon Secours with Dr Kisswamy for the third time.  He had an appointment on 3/9/12 which was canceled due to him being in the local hospital for GI bleed.  [T]his appointment was scheduled for 4/13/12 in which he refused stating" due to Lawsuit advised it's too late should have already been done and treated 18 months ago.

ECF No. 15, Exhibit JJ.  On June 7, 2012, the day Joubert allegedly stated Williams was "faking" she evaluated him after he reported falling and injuring his knee and right shoulder.  ECF No. 15, Exhibit NN.  Joubert noted on the medical chart that Williams had been ordered medication for pain, including Tramadol and scheduled him for a follow-up visit.  *See id*.  She instructed Williams to apply cold compresses, rest, and elevate his leg.  *See id*.

Williams' allegations against Joubert fail to show deliberate indifference to his serious medical needs.  Joubert's plan of treatment included diagnostic x-rays, a possible steroid injection for pain relief, and physical therapy.  Joubert's characterization of Williams as a "drug seeker" and her notice of his ripped knee brace, did not prevent her from providing him with continuing care for his medical complaints.  Williams' concerns with the conservative care provided evidence disagreement with the course of care and do not amount to a claim of constitutional violation.  Accordingly, summary judgment will be entered in favor of Joubert.

6.     Carla Buck, R.N. and Katie Winner, P.A.

Williams claims Carla Buck ("Buck") and Katie Winner ("Winner") refused to see him or "properly treat" him on May 29, 2012. E CF No. 1 at 4 and 6. Williams claims Winner did not order long-term medication for him and wanted him sent to for x-rays and to see Dr. Joubert. "Ms. PA Winner never made sure I went. I was never taken! So I stayed in my cell with possible broke collarbone in sever[e] pain for days." ECF No 1 at 6. Williams claims Buck refused to see him on June 6, 2012 for a "medical emergency." *See id.*

According to Defendants, there is no record of a sick call request or documentation these providers were aware of his complaints. Williams' medical records show x-rays were taken of his shoulder on May 31, 2012, and no acute fracture, dislocation or sublaxation was shown. ECF No. 15, Exhibit LL. Additionally, on June 1, 2012, Ottey saw Williams for a dislocated right shoulder and on June 7, 2012, for right shoulder and right knee pain. ECF No. 15. Exhibits MM. On June 7, 2012, Kristi Cortez, R.N. saw Williams who reported "passing out" during recreation when his right should and right knee "gave out" at the same time. *See id.* Williams requested an injection of Nubain and complained he was not receiving promised medication. *See id.* Williams asked the nurse to "call a medical code" and "refused to walk." *See id.*

Williams' claims against Winner and Buck, viewed in the context of his ongoing treatment, fail to show deliberate indifference. While Williams may not have received treatment from either of these providers as quickly as he felt was medically necessary, his medical record shows he received medical care and x-rays during that time period. He provides nothing to substantiate his allegation of a "medical emergency" necessitating immediate care. Again, Williams' allegations demonstrate his disagreement with medical providers over the course of

18

his care, not deliberate indifference to his serious medical needs. As such, summary judgment will be entered in favor of Winner and Buck.

7. <u>Colin Ottey, M.D</u>.

Williams generally claims Ottey did not treat his complaints in a proper and timely manner beginning in July of 2010 until the filing of the Complaint. Williams alleges Ottey refused to send him to an orthopedic surgeon, refused to provide pain medication, and refused to return Williams' knee brace. ECF No. 1 at 8.

On July 6, 2012, Dr. Ottey noted that Williams had recently been seen by an orthopedic surgeon who recommended an MRI of Williams' right shoulder and knee. *Id*.[16] "The patient was diagnosed with right second degree acromioclavicularjoint separation with possible rotator cuff tear and persistent arthritis with internal derangement of the right knee." ECF No. 15, Exhibit OO. Ottey ordered Ultram, Neurontin, a knee brace and shoulder sling for Williams based on the orthopedist's recommendations. *See id*.

On August 12, 2012, Dr. Ottey requested an MRI of Williams' right shoulder and knee. ECF No. 15, Exhibit PP. He requested an orthopedic follow-up the same day. *See id*. During transport to the MRI scheduled for September 3, 2012, Williams' shoulder "became dislocated," and the MRI was unable to be performed. ECF No. 15, Exhibit QQ. On September 7, 2012, Ottey ordered a prescription for Ultram (Tramadol) to extend until November 6, 2012. ECF No. 15, Exhibit RR.

Williams' allegations against Ottey are based on disagreement over the course of his treatment. The record shows Ottey provided medical care for Williams based on examination and recommendations made after orthopedic consultation. Williams' disagreement with medical providers over his care and the length of time that ensued between orthopedic appointments,

---

[16] The date of the appointment was unstated.

does not, as alleged here, constitute deliberate indifference to Williams' medical needs. Accordingly, summary judgment will be entered in favor of Ottey.

## CONCLUSION

Williams' records evidence that he was continuously treated during the time period at issue for his shoulder and knee pain. He received medical assessments including consultations with orthopedic surgeons, diagnostic imaging, physical therapy and pain medications. Further, his treatment is ongoing. Indeed, Williams' treatment continued even though there is suggestion that his condition was at times self-induced or deliberately exacerbated by him. Defendants have shown there is no genuine dispute as to any material fact and they movant is entitled to judgment as a matter of law.

In granting summary judgment to Defendants the court does not imply that the Williams is not entitled to medical treatment for his reportedly painful conditions. Even when the facts are viewed in the light most favorable to Williams, however, there is no genuine issue of material fact in dispute. Williams' complaints have been assessed and treated. The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged," *Wright*, 766 F.2d at 849, and none is shown here. At most, Williams has stated allegations of negligence or medical malpractice and they are not actionable in a constitutional claim. *See Daniels v. Williams*, 474 U.S. 327, 328–36 & n. 3 (1986); *Pink v. Lester*, 52 F.3d 73, 78 (4th Cir. 1995) *see also Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a

prisoner."). Williams' allegations of inadequate medical treatment simply do not amount to a claim of constitutional magnitude. For these reasons, Defendants are entitled to summary judgment in their favor as a matter of law. A separate Order granting summary judgment in favor of Defendants follows.

Date:   August 26, 2013                              /s/
                                        DEBORAH K. CHASANOW
                                        United States District Judge